UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
-----------------------------------------------------X
UNITED STATES OF AMERICA,

                                      :                  **Docket No. 83 Cr. 150 (LGS)**

          - v -                    :


GUY FISHER,                         :

                    Defendant.       :
-----------------------------------------------------X


## EMERGENCY MOTION FOR COMPASSIONATE RELEASE

## PURSUANT TO TITLE 18, U.S.C. SEC. 3582(c)(1)(A)(1)

Federal Defenders of New York
**Mark B. Gombiner, Esq.**
Attorney for Mr. Fisher
52 Duane Street - 10th Floor
New York, NY 10007
Tel.: (212) 417-8718

TO:        GEOFFREY BERMAN, ESQ.
            United States Attorney
            Southern District of New York
            1 St. Andrew's Plaza
            New York, NY 10007


Attn:      **Jarrod L. Schaeffer, Esq.**,
            Assistant United States Attorney

**INTRODUCTION**

Guy Fisher was the leader of a massive drug conspiracy.  In 1983, he was convicted in the Southern District of New York of narcotics conspiracy, racketeering and operating a Continuing Criminal Enterprise and sentenced to life without parole on the C.C.E. count.  Mr. Fisher has been incarcerated for 38 years--longer than most Americans have been alive.  Ed Koch was the Mayor of New York City, Ronald Reagan was President and Barack Obama was a college student when Guy Fisher began serving his term.

Today, Guy Fisher in no way resembles the drug kingpin whom Judge Pollak sentenced in January of 1984.  He is physically diminished, but he has grown immensely in the moral, academic and personal relationship realms.

Mr. Fisher has undergone an almost unique transformation for the good since being imprisoned.  Most crucially, he has come to understand the harms caused by his drug trafficking and he repents his actions.  He has also done everything possible to better himself and to help others.  As detailed below, his personal achievements include almost unparalleled academic success—he has earned not just his G.E.D., but a bachelor's degree, a master's degree, and a doctorate in sociology.  He has written numerous books and screenplays.  He has maintained a spotless disciplinary record.  He has used his talents and wisdom to teach and mentor other inmates and garnered awards and recognition for his efforts.  He has maintained the close support of his family and friends.  The sum total of his accomplishments is truly remarkable.

Mr. Fisher's achievements and his work on behalf of others are confirmed by the numerous and thoughtful letters attached to this motion from people who know him well, including family, close friends, community leaders and activists, and well-known people such as Debbie Allen, the producer and director of *Grey's Anatomy*.

1

In the last few years, Mr. Fisher has been diagnosed with pleural thickening and scarring, hypertension and hyperlipidemia.  He has had at least one bout of pneumonia.  These respiratory and cardiovascular conditions have left him extremely vulnerable to COVID-19, especially within the unhealthy confines of a prison setting.

Title 18, U.S.C. sec. 3553(a) factors also favor Mr. Fisher's release.  He does not pose any threat to the public.  Rather, a safe and stable residence with his sister, Florence, awaits him.  At the age of 73, he has been offered jobs and has created ambitious plans to use his life experiences to teach and guide inner-city youth and several organizations have already expressed interest in taking advantage of his talents in that regard.  The almost four decades that Mr. Fisher has served are disproportionately long for narcotics offenses.  The severity of the punishment he has already endured is surely sufficient to deter others from similar conduct and to promote respect for the law.

Mr. Fisher's beyond exemplary rehabilitation and community service, combined with the acute threat to his health and life posed by COVID-19 if he remains imprisoned, constitute "extraordinary and compelling reasons" for compassionate release, pursuant to Title 18, U.S.C. sec. 358(c)(1)(A).[1]  The following demonstrates that the motion for compassionate release should be granted.  After 38 years, it is time for Guy Fisher to come home.

---

[1] On July 10, 2020, Mr. Fisher, through counsel, filed an application for compassionate release with the Warden of FCI Yazoo City Medium.  **Exhibit A.**  Accordingly, his administrative remedies will have been exhausted by August 9, 2020.  Title 18, U.S.C. sec. 3582(c)(1)(A).

## STATEMENT OF FACTS

### A.  BACKGROUND

### 1.  <u>A Child of the Patterson Houses</u>

Born in 1947, Guy Fisher grew up in the Patterson Houses, a public housing development in the South Bronx.  Guy was the oldest of five children, born to Florence and Wallace Fisher. From his earliest years, Guy was surrounded by violence, both at home and in the streets.

Wallace Fisher, Guy's adoptive father, was an alcoholic and an abuser.  When drunk, as he so often was, he would verbally and physically attack Guy's mother.  Wallace also subjected Guy and his younger siblings to random and brutal beatings and verbal tirades.  As the oldest child, Guy endured the abuse and struggled to protect his mother and younger siblings from his father's assaults.

There was no peace to be found outside the home.  The Patterson Projects were built in the early 50's and conceived as a stepping stone to middle class stability for residents of Harlem and the Bronx.  By the early 60's, however, the projects had collapsed into a maelstrom of drugs, gangs, and rampant crime.  Guy and his family were too poor to move and Guy had to protect himself and his family on a daily basis.

Although he is extremely intelligent, the chaos of Guy's home and surroundings caused him to struggle in school.  Guy did, however, excel on the basketball court and was a popular figure in the neighborhood.

When Guy was still just a young teenager, his father abandoned the family.  Guy's mother worked as a nurse in the pediatric unit of a local hospital and did not make nearly enough money to support herself and her five children.

To help support the family, Guy sold handbags and then clothes out of the trunk of a car. Guy's sister, Florence, remembers her brother as fiercely determined to provide for his family and very protective of her.  "Guy is my oldest brother.  However, he also served as a father figure as my dad was often unavailable.   I was blessed in so many ways … as a direct result of my mother's undying love and my big brother Guy's giving heart."  **Exhibit B.**

## 2.  Crime and Punishment

Guy's drive and intelligence were not enough to let him escape from the pervasive crime that suffused the Patterson Projects.  Beginning as a teenager, he sustained five misdemeanor convictions and one youthful offender felony offense for assault and attempted rape.  He served about a year in custody for the felony conviction.

When he was about twenty-four or twenty-five, Guy was introduced to Nicky Barnes, a drug dealer.  Barnes had been a small-time drug dealer when he went to prison and met Joe Gallo ("Crazy Joey'), a high-ranking member of the Colombo Crime Family.  Gallo wanted to expand his heroin dealing in Harlem but lacked contacts with the African-American community.  He recruited Barnes to set up a drug-trafficking organization once Barnes was released from prison. He also explained to Barnes the Mafia principles for operating a criminal enterprise.  Nicky Barnes proved to be a very good student.  By the time Guy Fisher met him, Barnes was already the biggest drug dealer in Harlem.

Soon after he met Nicky Barnes, Guy Fisher began selling drugs for the Barnes DTO.  In 1972, Barnes formed a group known as the "The Council."   The Council was a seven-man group headed by Barnes with the goal of handling disputes between criminals and otherwise assuring that Barnes' heroin trade operated efficiently.

Guy Fisher moved up quickly through the ranks and was selected as one of the seven members of the Council.  For the next several years, he served as one of Barnes' trusted lieutenants and was responsible for selling large amounts of drugs.

Although he made big money from selling drugs, Guy continued to live in the Patterson Projects and was noted for his support to the people who lived there.  In 1977, Mr. Fisher became the first Black man to own the Apollo Theater, the center of Black cultural life in Harlem.  He also invested in other businesses with the hope of eventually getting out of the drug trade.

Guy also helped countless residents by paying for clothing, food, school books and college tuition.[2]  Willie Rice, for example, has known Guy for 43 years.  He recalls that "while growing up I seen Mr. Fisher buy kids in the neighborhood sneakers, uniforms for his basketball team.  Give us tickets for Apollo Theater concert food to myself and other people family buy books and school supplies for kids." **Exhibit C.**

**3.   Arrest, Indictment and Conviction**

In 1978, Nicky Barnes, who had earned the moniker "Mr. Untouchable",[3] was prosecuted and convicted in the Southern District of New York.  Mr. Fisher was also a defendant in that case but was acquitted.  Nicky Barnes received a life sentence without possibility of parole.

Following Barnes's conviction and sentence, Mr. Fisher continued to be involved in the distribution of heroin, as one of the successor leaders of the Barnes drug organization.  For the next several years, Mr. Fisher worked with others to distribute large quantities of drugs in the New York City area.

---

[2] In noting these facts, Mr. Fisher does not contend that his good acts are a defense or excuse to his criminal conduct.  He recognizes that his charitable activities were made possible by drug dealing that inflicted immense harm on his community.

[3] The June 5, 1977 issue of *The New York Times Magazine* showed Barnes posing for a picture with that title.

On March 9, 1983, Mr. Fisher was arrested and held without bail on federal drug charges filed in the Southern District of New York.  A 15-count superseding indictment, returned in September of 1983, charged him and seven other people with narcotics and racketeering violations as well as one count of a conspiracy to murder government witnesses.

The 45-page long indictment charged Mr. Fisher in six counts with (1) a narcotics conspiracy; (2) operating a continuing criminal enterprise, (3) heroin distribution, (4) racketeering enterprise conspiracy, (5) operating a racketeering enterprise, and (6) conspiring to murder government witnesses.  The narcotics conspiracy count alleged 78 overt acts and the RICO conspiracy charged 39 predicate acts, primarily involving accusations of narcotics transactions and murders or attempted murders.  The racketeering predicate acts and the overt acts in support of the narcotics conspiracy were virtually identical.  The count that directly charged Mr. Fisher with a violent act was Count 15, conspiracy to murder government witnesses.

On November 21, 1983, the jury returned a verdict of guilty on the narcotics conspiracy, Continuing Criminal Enterprise and racketeering charges.  Mr. Fisher was acquitted on the accusation of attempt to murder government witnesses.  Because there were no special verdicts on the narcotics conspiracy and racketeering counts, it is impossible to know what predicate or overt acts the jury found to have been proved.

On January 12, 1984, Judge Pollak sentenced Mr. Fisher to life without parole for his conviction on the Continuing Criminal Enterprise charge and two consecutive twenty-year sentences on the RICO and RICO conspiracy counts.[4]

---

[4] In 1998, Judge Pollak granted Mr. Fisher's motion to dismiss Count One of the indictment.

## B.  EXTRAORDINARY REMORSE, REHABILITATION AND ACHIEVEMENTS WHILE IMPRISONED

Guy Fisher began serving his life sentence at the United States Penitentiary in Marion. At the time, Marion was the most maximum security prison in the federal system, housing inmates like John Gotti and Tommy Silverstein, the head of the Aryan Brotherhood.  When Mr. Fisher arrived at Marion, it was in a state of "permanent lock-down" following the murder of two guards in October of 1983. Marion had a well-deserved reputation for being the harshest prison within the BOP.  Guy was left alone in a cell, confined almost 24 hours a day.

Most people would have succumbed to despair or fumed with rage at finding themselves in such a dismal situation.  Guy Fisher, however, had a different approach.  He began to contemplate what he had done to end up in such a situation and to consider how he could change his life.

### 1.  Remorse and Acceptance of Responsibility

First, and perhaps most importantly, Mr. Fisher grappled with his own misconduct and the harms it had caused.  The key to Mr. Fisher's rehabilitation has been the recognition that no amount of wealth or power or even good works could erase the damage caused to others by his drug dealing.  Even today, decades later, Mr. Fisher remains haunted by his actions.  He begins his letter to the Court by stating "I know I cannot change my past, nor can I hide the negatives of my past and above all I am ashamed of who I was." **Exhibit D.**

Guy did much more, however, than accept responsibility for his wrongdoings.  He determined both to improve himself and to become a guide and mentor for others.  It has been a long journey, but he has accomplished both goals.  The following is a brief outline of Mr. Fisher's accomplishments since imprisoned.

2.  **Education Behind Bars**

When Mr. Fisher went to prison, he did not even have a high school diploma.  Very smart but lacking academic skills, he decided to avail himself of any educational opportunities that the BOP offered.  As confirmed by BOP records, transcripts and diplomas, he succeeded beyond his wildest dreams.

In 1991, while incarcerated at the United States Penitentiary in Leavenworth, Kansas, Mr. Fisher earned his G.E.D.  **Exhibit E.**  He immediately went on to enroll at Saint Mary College[5], a Leavenworth school that offered classes to Leavenworth USP inmates.  Mr. Fisher obtained his Associate of Arts degree in May of 1992.  **Exhibit F.**  Guy did not stop there.  He continued his education at St. Mary, taking numerous courses in the liberal arts—e.g. psychology, art, Spanish, American history, and religion.  He was a diligent and thoughtful student.  As a result, he earned his Bachelor's degree from St. Mary.  **Exhibit G.**

Mr. Fisher continued his studies after being transferred from Leavenworth.  He enrolled at Columbus University, a distance learning institution headquartered in Picayune, Mississippi.[6] Guy obtained a Master's degree from Columbus in 2006 and a Doctorate degree in Sociology in 2009.  **Exhibits H and I.**  He appears to be the first inmate in the history of the BOP to earn a doctorate while imprisoned.

Mr. Fisher has also completed dozens of other courses during his years in prison.  The BOP list of the educational and life-skill courses he has completed takes up almost three pages. **Exhibit J.**

---

[5] St. Mary College became the University of Saint Mary in 2003.  It is an accredited Catholic college, founded by the Sisters of Charity of Leavenworth in 1923.
[6] There is some question as to the accreditation of Columbus University.  According to a Wikipedia article, Columbus University is accredited by the XXXX

### 3.  Books and Screenplays

Mr. Fisher has used his education to write many books and screenplays.  Among the books are *Mother's Love, Evolution of Prisons, Inside Out, and Vicious Circle.*  His books draw on his own experiences and also seek to provide a voice for his fellow inmates.  A full list and description of his books is available on the internet at mtuproductions.com.

Mr. Fisher's writing has been encouraged by Debbie Allen, a well-known actress, director and producer of *Grey's Anatomy*.  Ms. Allen writes that after visiting Mr. Fisher in prison, "I helped him establish a screenwriting program for his fellow inmates, some of whose work I already read and critiqued."  **Exhibit K.**

### 4.  Teaching and Mentoring

Mr. Fisher has been just as energetic at helping others as in improving himself.  He has focused on teaching and mentoring other inmates.  He has also devoted much effort and thought to planning for a future in which he can use his own experiences on behalf of inner-city youth.

Mr. Fisher's teaching activities are confirmed by BOP records.  **Exhibit L.**  He also earned a meritorious good time award in 2011 for his "outstanding work in the education department as an ED tutor."  **Exhibit M.**

On an unofficial basis, Mr. Fisher has gained wide recognition for his role as a mentor to younger inmates.  In a letter to President Obama in support of his clemency application, Mr. Fisher describes his mentoring activities to younger inmates.  **Exhibit N.**

The efficacy of his work is confirmed by others on the outside. Roach Brown, the host of the Cross Roads radio show, states that several young men who had been counseled by Guy while incarcerated have appeared on his radio program.  "They all gave credit to Mr. Guy Fisher

whose wisdom and insights and accomplishments inspired them where it seemed that all hope was gone." **Exhibit O.**

Many other letter writers similarly acknowledge his mentoring contributions.  For example, Charlene Spivey declares "His time I heard is counseling younger inmates in the right way to live and exist in this world." **Exhibit P.**  Kyle Kerr, a fellow inmate, has observed Mr. Fisher as "an advocate for young men to turn their lives around and reject the negativity and criminal behavior than has landed so many of our youth in prison." **Exhibit Q.**

In further pursuit of this goal, Mr. Fisher has established the G.U.Y. Foundation (Guiding Unchallenged Youth).  Mr. Fisher envisions this organization as establishing neighborhood centers to materially assist and provide positive activities and inspiration for inner-city youth. A.B. Reed writes: "Due to Mr. Fisher's strong desire to steer others in a positive direction, he has established the G.U.Y. Foundation.  This foundation seeks to, not only offer assistance with the material and employment needs of community youth and formerly incarcerated individuals, but to, also, provide assistance with the mentoring needs that are so often needed, although not readily available, in communities of color across the country." **Exhibit R.**

5.  **Work and Good Behavior**

Mr. Fisher has maintained a virtually spotless disciplinary record despite serving much of his time at some of the nation's toughest prisons.  His good behavior is confirmed by BOP progress reports. **See Exhibit S.**

Mr. Fisher has also worked steadily in a variety of capacities.  BOP records show that since being imprisoned, he has been steadily employed in positions ranging from safety orderly to education tutor. **Exhibit T.**

**6.   Letters of Love and Support from Mr. Fisher's Family and Friends**

Despite the fact that he has been locked away for so many years, Mr. Fisher has managed to maintain his pre-arrest relationships and to foster new ones.  Thus, the attached letters are not merely form missives of support.  Rather, they come from people who truly know, love and respect Mr. Fisher.  For example, Richard Burton, a former Deputy Sheriff and celebrated middleweight boxer, met Guy's sister in the 1980's and they became close friends.  Mr. Burton writes that "I have never been able to meet Guy, who I call big brother, but I have spoken to him many, many times on the phone since the 1980's."  **Exhibit U.**  As a result, Mr. Burton is able to state that "I have learned a lot from him through speaking and I can feel the change in my big brother." **Id.** [7]  Dr. David Brown, a former street hustler who has known Mr. Fisher since the early 1980's, expresses similar sentiments.  **Exhibit KK.**

It would take too long to summarize all of the letters written in support of Mr. Fisher.  But there are two basic themes.  The writers recognize and greatly respect the tremendous efforts Mr. Fisher has made to turn himself into the opposite of the drug dealer who was sentenced by Judge Pollack in January of 1984.  The writers are equally aware of and support Mr. Fisher's dedication to teaching and mentoring younger people and his hopes to continue that work if released.

Mr. Fisher's very strong family support deserves special attention.  Attached are letters from his sister, Florence Fisher-Lacy; his daughter, Shaneike Kai Fisher Ayala; his cousin, Charlene Spivey; his half-sister Audrey Savage; and his first cousin, Glynis Fisher Andrews.

---

[7] Although they do not know him as well personally, prominent members of the community support Mr. Fisher's release.  A 2016 letter to President Obama asking for the commutation of Mr. Fisher's sentence was signed by numerous community leaders including New York State Senators Bill Perkins and Ruth Hassell-Thompson, Johnny Ford, the Mayor of Tuskegee, Alabama, and Dr. Steven McCroey, the CEO of Harvestime Ministries, Worldwide. **Exhibit V.**

**Exhibits B, W, P, X and Y.** The intense, palpable love and respect conveyed by these letters is genuinely remarkable considering that Mr. Fisher has been apart from them for many decades. Shaneike speaks for all of the family when she writes "It's been the majority of my life that I get on my knees and pray that one day we can all sit together as a family and he will be free." **Exhibit W.**

**7. Post-Release Plans**

If he is released from prison, Guy plans to live with his 62-year-old sister, Florence Fisher-Lacy, her husband and their 17-year-old son. Ms. Fisher-Lacy has been married for 22 years and is a clothing designer. Her husband is a real estate broker. They live in a three-bedroom, two-bath home in Deltona Beach, Florida.

Mr. Fisher has very enthusiastic plans for what he will do if released. As discussed above, he is hoping to bring the G.U.Y. Foundation to life and establish neighborhood centers for disaffected youth.

Mr. Fisher also has garnered commitments of support and offers of employment and speaking engagements from numerous people. Debbie Allen declares that "I am willing to help Guy realize his true potential upon release." **Exhibit K.** Ronald Gantt, the director of *Breaking Ground*, a long-standing community group, is so confident of the benefits that Mr. Fisher can offer that he states, "This organization is willing to offer Dr. Fisher the opportunity for employment as a Director of Inclusion and Engagement…." **Exhibit Z.** Ronald Backus writes that Mr. Fisher "would be a great asset to Kennedy Center in Harlem speaking to our youth." **Exhibit AA.** Rhozier "Roach" Brown, the host of the *Cross Roads* radio show, promises that "I am willing to offer whatever reentry assistance he may need." **Exhibit O.**

## C.  ADVANCED AGE AND HEALTH ISSUES RENDER MR. FISHER ESPECIALLY VULNERABLE TO COVID-19.

In 1975, Guy Fisher suffered serious injuries in a motorcycle accident, including a punctured lung and contusions of his heart.  These injuries have never fully healed and, perhaps as a consequence, Mr. Fisher has experienced a number of respiratory illnesses and damage to his lungs.

In 2019, after Mr. Fisher had been experiencing coughing for more than two weeks, a chest X-ray revealed "blunting of the right costophrenic angle likely representing pleural thickening/scarring." **Exhibit BB.**  Pleural thickening occurs when the lining of the lungs thickens with scar tissue.  It can result in breathlessness and chest pain.  Mr. Fisher has also suffered from a number of respiratory illnesses while incarcerated, including pneumonia.

Over the last several years, Mr. Fisher has repeatedly had blood pressure readings that indicate hypertension.  In August of 2019, his blood pressure was 147/88; in October of 2019, it was 165/19; on November 2019, it was 145/91.  **Exhibits CC, DD, EE.**  All of these readings are significantly elevated.  According to the American Heart Association, a systolic level greater than 140 puts one in Stage 2 hypertension.

 Mr. Fisher's cholesterol levels have also been too high.  In November, 2018, his cholesterol level was 253 and his HDL was 80. **Exhibit FF.**  In August of 2019, his total cholesterol level was 236 and his HDL was 80. **Exhibit GG.**  He has a diagnosis of hyperlipedemia and has been prescribed Atorvastin (a drug to lower cholesterol). **Exhibits HH and II.**

Finally, Mr. Fisher turned 73 in July 2020. He also has other health conditions typical of people in his age group (i.e. prostate, serious dental issues). As discussed below, his age alone renders him especially vulnerable to COVID-19.

**ARGUMENT**

**A. GUY FISHER'S EXTRAORDINARY REHABILITATION, HIS VULNERABILITY TO COVID-19 WHILE INCARCERATED AND THE SECTION 3553(A) SENTENCING FACTORS SUPPORT HIS COMPASSIONATE RELEASE AFTER 38 YEARS BEHIND BARS.**

**1.   Mr. Fisher's Extraordinary Rehabilitation**

Title 18, U.S.C. Sec. 3582(c)(1)(A) grants a Court the power, on motion of a defendant, to reduce a sentence for "extraordinary and compelling" reasons.  Mr. Fisher's extraordinary rehabilitation, including exceptional remorse, educational accomplishments, good behavior, mentoring and community service rise to the level of "extraordinary and compelling."  In combination with the acute peril to his health and life posed by COVID-19, compassionate release is warranted.[8]

Two recent grants of compassionate release from judges in the Southern District of New York to inmates serving life sentences demonstrate the pivotal importance extraordinary rehabilitation may play in granting an application for compassionate release.

*United States v. Jorge Torres and Victor Torres*, 87 Cr. 593 (SHS), 29020 WL 2815003 (S.D.N.Y, June 1, 2020) concerns two brothers who were convicted and sentenced  to life without parole in 1988 for conducting a Continuing Criminal Enterprise.  The brothers were found guilty of heading a massive, long-running heroin distribution operation on the Lower East Side that yielded over ten million dollars in profits.

At the time the Torres brothers moved for compassionate release, they had spent over 30 years in prison.  During their decades in prison, the Torres brothers rehabilitated themselves and

---

[8]  Title 28, U.S.C. 994(t) provides that "[R]ehabiliation of the defendant *alone* shall not be considered an extraordinary and compelling reason," emphasis supplied.  This limitation, however, does not prevent a court from considering rehabilitation as a relevant factor. *United States v. Millan*, 91 Cr. 685 (LAP), 2020 WL 1674058 (S.D.N.Y., April 6, 2020); *United States v. Cantu-Rivera*, 89 Cr. 204, 2019 WL 25778272 (S.D. Tex., June 24, 2019).

did much to help their fellow inmates and the community at large.  They were 59 and 63 years old and suffering from various illnesses, including high blood pressure.

Judge Stein ruled that the Torres brothers' sentences should be reduced to time served. He concluded that the combination of extraordinary rehabilitation, coupled with the increased health risks to the Torres' from COVID-19, satisfied the requirements of Section 3582(c)(1)(A). With respect to rehabilitation, the Court cited the Torres' brother prison employment history, educational accomplishments while incarcerated, remorse, community service, and roles as unofficial mentors. Their decades-long record of community service and good deeds "exceed the bounds" of what is ordinarily considered to be rehabilitation. Id. at 11.

*United States v. Millan*, 91 Cr. 685 (LAP), 2020 WL 1674058 (S.D.N.Y., April 6, 2020) is another example of compassionate release being granted to a drug kingpin serving a sentence of life imprisonment.  Eric Millan was the head of the notorious "Blue Thunder" organization, a vast drug conspiracy that distributed more than five hundred kilograms of heroin over the course of many years.  When he applied for compassionate release, Millan was 57 and had served about 28 years of his sentence.

Judge Preska found that compassionate release was warranted based largely on Mr. Millan's conduct while in prison.  "[D]espite having had no realistic hopes of release, Mr. Millan has done everything in his power to rehabilitate himself, as demonstrated by his genuinely exceptional accomplishments and meritorious prison record.  He is remorseful and contrite and has fully accepted responsibility for his crimes."  2020 WL 1674058 *9. The same words could be written about Guy Fisher.

 Of course, Mr. Fisher's facts are not identical to those of Torres or Milan. Fundamentally, however, Mr. Fisher's tremendous educational achievements, exemplary

disciplinary and work history, dedicated teaching and mentoring, his writings and his moral growth mirror the extraordinary rehabilitation of the defendants in Torres and Millan.  Patricia Figgures writes that "Guy Fisher took rehabilitation to another level." **Exhibit JJ.**  She is right and, for that reason, like Eric Millan and Victor and Jorge Torres, he should be granted release.

2.  <u>**Mr. Fisher's Extreme Vulnerability to COVID-19 While Incarcerated is an Extraordinary and Compelling Reason for Compassionate Release.**</u>

Medical issues may constitute "extraordinary and compelling circumstances."  An incarcerated defendant's particular vulnerability to COVID-19 may constitute "extraordinary and compelling circumstances"  Accordingly, this Court, and many others, have concluded that "the increased risk of COVID-19 in prison settings coupled with a defendant's advanced age create 'extraordinary and compelling" reasons under the policy statement." *United States v. Olszweski*, 15 CR. 364 (WHP), 2020 WL 2420483 at 4 (S.D.N.Y. May 12, 2020).  <u>See</u> <u>also</u>, *United States v. Hernandez*, 18 Cr. 834 (PAE), 2020 WL 1684062, at *3 (S.D.N.Y. Apr. 2, 2020); *United States v. Perez*, 17 Cr. 513 (AT), 2020 WL 1546422, at *4 (S.D.N.Y. Apr. 1, 2020); *United States v. Gross*, 15 Cr. 769 (AJN), 2020 WL 1862251, at *3 (S.D.N.Y. Apr. 14, 2020).

Mr. Fisher is at especially high risk for contracting and developing severe COVID-19 based on his age and his pulmonary and cardiovascular problems.

a.  <u>**Hypertension**</u>

As discussed above, Mr. Fisher has recently and repeatedly had blood pressure readings that indicate Stage 2 hypertension.  This condition alone makes him especially vulnerable to the ravages of COVID-19.

Hypertension has "been associated with increased illness severity and adverse outcomes" from COVID–19.  CDC, Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID–19), *available at* https://bit.ly/3cjQyRM. *See also* CDC COVID–

19 Response Team, Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019—United States, February 12–March 28, 2020, at 383, CDC, Morbidity & Mortality Weekly Report (Apr. 3, 2020) ("Prevalence Report"), *available at* https://bit.ly/34A6RqI (concluding, "consistent with findings from China and Italy," that "patients with underlying health conditions and risk factors, including ... hypertension, ... might be at higher risk for severe disease or death from COVID–19"); World Health Org., Report of the WHO–China Joint Mission on Coronavirus Disease 2019 (COVID–19), at 12 (Feb. 24, 2020) ("WHO–China Report"), *available at* https://bit.ly/2ySm9eH ("Individuals at highest risk for severe disease and death include ... those with underlying conditions such as hypertension."). The WHO has found that the mortality rate among those with hypertension is 8.4%, compared to 1.4% for those otherwise healthy. *Id.*; *see also* Wu et al., Characteristics and Important Lessons from the Coronavirus 2019 (COVID–19) Outbreak in China, J. Am. Med. Ass'n (Feb. 24, 2020) (finding mortality rate of 6.0% among those with hypertension, versus 2.3% overall), https://bit.ly/2VaesJN.

Hypertension, either standing alone, or in combination with other medical issues, has been cited as a reason for granting compassionate release by this Court and in numerous other recent cases. *United States v. Lowe*, 14 Cr. 55 (LGS), 2020 WL 3640580 (S.D.N.Y., July 6, 2020) (discussing findings that persons with hypertension may be at greater risk for severe consequences from COVID-19); *United States v. Molina Acevedo*, 18 Cr. 365 (LGS), 2020 WL 3182770 (S.D.N.Y., June 15, 2020). *See also United States v. Sawicz*, 08 Cr. 287 (ARR), 2020 WL 1815851 (E.D.N.Y. Apr. 10, 2020) (ARR) (hypertension alone in 43-year-old defendant); *United States v. Zukerman*, 16 Cr. 194 (AT), 2020 WL 1659880 (S.D.N.Y. Apr. 3, 2020) (hypertension, diabetes, obesity); *United States v. Colvin*, 2020 WL 1613943 (D. Conn. Apr. 2,

17

2020) (hypertension, diabetes); *United States v. Rodriguez*, 2020 WL 1627331 (E.D. Pa. Apr. 1, 2020) (hypertension, diabetes, obesity); *see also, e.g.*, *United States v. Burrill*, 2020 WL 1846788 (N.D. Cal. Apr. 10, 2020) (multiple conditions, including hypertension and diabetes); *United States v. Hansen*, 2020 WL 1703672 (E.D.N.Y. Apr. 8, 2020) ( (multiple conditions, including hypertension and diabetes); *United States v. Resnick*, 12 Cr. 152 (CM), 2020 WL 1651508 (S.D.N.Y. Apr. 2, 2020) *United States v. Muniz*, 2020 WL 1540325 (S.D. Tex. March 30, 2020) (multiple conditions, including hypertension and diabetes).

Mr. Fisher has also been diagnosed with hyperlipidemia. **Exhibit II.**  Hyperlipidemia has been cited by many courts in compassionate release cases as a condition that places an inmate at greater risk for serious illness or death if infected with COVID-19.  *See e.g., United States v. Somerville*, 2020 WL 2781585 (W.D. Pa., May 29, 2020); *United States v. Anderson*, 2020 WL 2521513 (C.D. Ill., May 18, 2020); *United States v. Jianguo Han*, 2020 WL 3620069 (D. Nev., July 2, 2020).

**b.  Advanced Age and Pulmonary Complications**

Mr. Fisher's age and other medical problems also place him at greater risk for experiencing severe illness should he contract COVID-19.  Mr. Fisher is now 73 years old. According to the Centers for Disease Control and Prevention, persons above the age of 70 face a far greater risk of hospitalization and death if they contract COVID-19; *United States v. Plunk*, 94 Cr. 36 (TMB), 2020 WL 3582902 (D. Ak., April 9, 2020) (defendant's age of over 70 was compelling reason for compassionate release).

Mr. Fisher's various pulmonary issues raise additional concerns with respect to COVID-19.  COVID-19 is known to attack the lungs.  Mr. Fisher's history of a punctured lung,

pneumonia, and pleural thickening and scarring would seem to make him more susceptible to serious consequences if he were infected.

**c.   BOP Prison Conditions Place Mr. Fisher at Special Risk from COVID-19**

This Court and very large number of other courts in this District and elsewhere have found that the risk of transmission and the difficulty of care in BOP facilities also constitute extraordinary and compelling reasons for sentence reductions under Section 3582(c)(1)(A). *United States v. Damian Campagna*, 16 Cr. 78 (LGS), 2020 WL 1489829, at *1 (S.D.N.Y. Mar. 27, 2020) (citing studies and cases that find that "'inmates may be at a heightened risk of contracting COVID-19 due to the conditions of confinement'").  Other courts have reached the same conclusion.  "[C]onditions of confinement—sharing small cells, eating together, using same bathrooms and sinks, delays in medical evaluation and treatment, and rationed access to soap—make prisons more potentially conducive to the transmission of COVID-19 than elsewhere."  *United States v. Haney*, 19 Cr. 541 (JSR), 2020 WL 1821988, at *6 (S.D.N.Y. Apr. 13, 2020).  "Jails and prison are powder kegs for infection.  People in jails and prisons cannot practice social distancing, control their exposure to large groups, practice increased hygiene, wear protective clothing, obtain specific products for cleaning and laundry, avoid frequently touched surfaces, or sanitize their own environment."  *United States v. Skelos*, 15 Cr. 317 (KMW), 2020 WL 1847558, at *1 (S.D.N.Y. Apr. 12, 2020). *See also United States v. Phillip Smith*, 12 Cr. 133 (JFK), (S.D.N.Y. Apr. 13, 2020); *United States v. William Knox*, 15 Cr. 445 (PAE), (S.D.N.Y. Apr. 10, 2020); *United States v. Leon Santiago*, 12 Cr. 732 (WHP), (S.D.N.Y. Apr. 10, 2020); *United States v. Nehemiah McBride*, 15 Cr. 876 (DLC) (S.D.N.Y. Apr. 7, 2020); *United States v. Tia Jasper*, 18 Cr. 390 (PAE) (S.D.N.Y. Apr. 6, 2020); *United States v. Clark Harris*, 18 Cr. 364 (PGG) (S.D.N.Y. Apr. 6, 2020); *United States v. Nunzio Gentille*, 19 Cr. 590

(KPF) (S.D.N.Y. Apr. 9, 2020); *United States v. Zukerman*, 16 Cr. 194 (AT), 2020 WL 1659880, at *1 (S.D.N.Y. Apr. 3, 2020); *United States v. Resnick*, 12 Cr. 152 (CM (S.D.N.Y. Apr. 2, 2020); *United States v. Daniel Hernandez*, 18 Cr. 834 (PAE) (S.D.N.Y. Apr. 1, 2020); *United States v. Wilson Perez*, 17 Cr. 513 (AT) (S.D.N.Y. Apr. 1, 2020); *United States v. Eli Dana*, 14 Cr. 405 (JMF) (S.D.N.Y. Mar. 31, 2020).

BOP statistics demonstrate that the increased risk to inmates is not just hypothetical. As of July 30, 2020, a total of 11,751 BOP inmates and BOP staff have tested positive for COVID-19. 103 inmates have died.  The infection rate within the BOP is 5.47 that of the United States as a whole and more than 18 times that of Italy, one of the other countries hit hardest by COVID-19. *See* www.cdc.gov https://coronavirus.jhu.edu/map.html *and* www.bop.gov/coronavirus.

Mr. Fisher is currently confined at Yazoo City FCI Medium.  The most recent data for Yazoo City FCI Medium shows that one inmate and five staff members are currently infected. Since the start of the pandemic, a total of 8 inmates and 15 staff members have tested positive for COVID-19.  Three inmates have died in other portions of the BOP Yazoo City complex.

## B.  THE SECTION 3553(A) SENTENCING FACTORS SUPPORT A SENTENCE REDUCTION.

Mr. Fisher's medical conditions and the circumstances of his incarceration constitute "extraordinary and compelling reasons" that warrant his release.  However, before granting the application, the Court, pursuant to Title 18, U.S.C. sec. 3582(c) (1) (A) must also consider the sentencing factors set forth in Title 18, U.S.C. sec. 3553(a).  Application of the 3553(a) factors requires the Court to consider whether the relevant factors outweigh the otherwise extraordinary and compelling reasons warranting release and whether compassionate release would undermine the goals of the original sentence. *United States v. Daugerdas,* 09 Cr. 581 (WHP), 2020 WL 2097653 at 4 (S.D.N.Y., May 1, 2020)  Given the 38 years he has been imprisoned, the relevant

3553(a) factors do not outweigh the combination of Mr. Fisher's truly extraordinary rehabilitation and his vulnerability to COVID-19. Nor would release at this late date undermine the goals of the original sentence.

Section 3553(a) broadly instructs the Court to consider the "history and characteristics of the defendant" and the "nature and circumstances of the offense." More specifically, the statute requires, *inter alia,* a sentencing court to evaluate whether (1) the sentence would "reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense, (2) afford adequate deterrence to criminal conduct, (3) protect the public from further crimes of the defendant, and (4) avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."

The history and characteristics of Mr. Fisher strongly favor granting his release. As detailed above, Mr. Fisher had a very difficult childhood and fell into a life of crime. However, his outstanding conduct and achievements over the past decades leave no question of his present good character and concern for others. The letters written on his behalf underscore the love and respect that Mr. Fisher has generated through his words and deeds.

The knottier issues involve the "nature and circumstances of the offense". The question is whether, in light of his grave narcotics transgressions, his release after almost forty years would undermine respect for the law or insufficiently punish the offense or be too lenient a sanction to deter Mr. Fisher or others from engaging in such conduct.

The answer to these questions must be in the negative. It is certainly true that Mr. Fisher's narcotics distribution offenses were near the apex of such crimes. He was the leader of a very large-scale organization that sold a great deal of heroin over many years. His conduct was reprehensible and deserving of severe punishment.

Thirty-eight years in prison, however, is surely enough time to achieve any legitimate goal of sentencing.  Mr. Fisher went to jail as a young man.  He is now elderly, sick and hoping to spend his twilight years counseling young people to avoid his fate.  It is hard to believe that anyone would look at the time Guy Fisher has spent in prison for selling drugs and conclude that his release means that he got off easy or had escaped justice.  To the contrary, release at this point would actually promote respect for the law by confirming that our justice system allows for the possibility of rehabilitation and redemption.

The Court also must consider the "need to protect the public from further crimes of the defendant."  This is not a hard call.  At the age of 73 and more than fully rehabilitated, Mr. Fisher is obviously not going to return to narcotics crimes or any other criminal activity.  He has a home with his sister and her husband waiting for him as well as the support of people like Debbie Allen.  Mr. Fisher knows better than anyone how drugs can ruin one's life and he is not going back to that world.

Finally, Section 3553(a)(6) directs a sentencing judge to consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."  There is no question that Mr. Fisher committed a very serious narcotics crime.[9]  His sentence of life without parole, however, is disproportionately severe compared to that of sentences imposed on other leaders of major drug trafficking organizations.

Judge Stein addressed the issue of unwarranted sentencing disparity in *Torres*.  As noted, the Torres brothers, like Mr. Fisher had received life sentences for heading a large drug-

---

[9] The verdicts returned against Mr. Fisher established only his guilt of conspiracy, narcotics distribution, and conducting a continuing criminal enterprise.  Although the RICO and narcotics conspiracy alleged Mr. Fisher's participation in several murders as overt or predicate acts, the jury did not have to find he committed any murder before convicting him of the offenses.  Mr. Fisher was found not guilty on the sole count (Count 15)—conspiracy to murder government witnesses—that directly accused him of participating in murder.

trafficking organization. Judge Stein agreed with the defendants' contention that their life sentences are "disproportionately severe compared to the sentences received by the leaders of major drug trafficking organizations." *Torres* at 6.  Moreover, the recent resentencing of Victor and Jorge Torres and Eric Millan—themselves heads of huge drug trafficking operations—is further proof that Mr. Fisher's sentence of life without parole is disproportionately severe.

## CONCLUSION

For the foregoing reasons, the motion for compassionate release should be granted and Mr. Fisher should be resentenced to a term of time served.

Respectfully submitted,

*Mark B. Gombiner*

Mark B. Gombiner
Attorney for Guy Fisher

Cc:  A.U.S.A. Jarrod Schaeffer