# Exhibit D

PLD:kt
3-2863/2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA          :

    - v -                        :    SS 83 Cr. 150 (MP)

GUY THOMAS FISHER, et al.,        :

              Defendants.    :

- - - - - - - - - - - - - - - - -x

## GOVERNMENT'S SENTENCING MEMORANDUM

The Government respectfully submits this memorandum in connection with the sentencing of Guy T. Fisher, Frank James, Wallace Rice, Thomas Forman, Elmer T. Morris, James Wheelings and Kenneth Thomas presently scheduled for January 12, 1984. It is our purpose briefly to present the Government's views concerning the crimes proved at trial and each defendant's criminal history.

This case is unprecedented in several respects. For the first time in any single prosecution, four defendants have been convicted under the Continuing Criminal Enterprise statute -- the most serious narcotics crime prosecutable in the United States. For the first time as well, the entire leadership of a major criminal syndicate is now in jail. In addition to the five "Council" members convicted in this case (Fisher, James, Rice, Muhammed and Forman), Leroy Barnes is presently serving a life sentence and Joseph Hayden is presently serving a lengthy sentence as a result of their convictions in this District in 1978.

PLD:kt
3-2863/2

As will be discussed below, this organization through massive narcotics dealing and a long string of murders has inflicted incalculable damage to this city.

A.  The Council

As the Government proved at trial, the Council was formed in 1973 as the brainchild of Frank James. It was his idea that competing black narcotics organizations should join together under the auspices of a governing "Council." As a consequence, Fisher, James, Rice, Muhammed, Foreman, Barnes and Hayden -- each of whom headed their own powerful narcotics organization -- swore a secret oath of brotherhood and joined their organizations from the Bronx, Manhattan and Brooklyn into a massive city-wide narcotics syndicate employing hundreds of mill workers, distributors and street dealers. In the decade that followed, the Council flourished purchasing up to thirty kilograms of pure heroin a month, diluting it into hundreds of pounds of street heroin and earning millions of dollars in profits. In addition to flooding the streets of this city with heroin, cocaine, angel dust and marijuana, the Council unleashed a reign of terror. Altogether the Government proved nine murders at trial and the severe wounding of a tenth intended victim.

PLD:kt
3-2863/2

Of course, as the trial evidence suggests, these were not the only murders committed by the Council. There was testimony, for example, that Guy Fisher and his lieutenant James Wheelings, participated in the "chain-saw" execution of two additional victims. Moreover, as the Government's 3500 material for James Hughes reveals (GX 3750(C), 3750(D)), and as the witness would so testify, in 1978 Frank James had on his full-time payroll a four-man team of professional killers. One of these assasins, James Hughes, was inducted into the James organization only after he proved himself by murdering a randomly-selected passerby in January 1978. Later that month, the James "hit squad" murdered a witness in a State narcotics prosecution against one of James surordinates and subsequently killed a third individual.

The Council's size, unhesitating resort to violence, and unrestricted access to money rendered it virtually immune to prosecution. Of the eight defendants convicted at trial, six have never before been convicted for Council-related crimes and no high-ranking member of the organization had previously been convicted of any of the countless crimes of violence committed by them. In part, this was because it was the Council's policy to ferret out and murder suspected informants. The Council executed at least five suspected informants and shot a sixth three times in the head.

PLD:kt
3-2863/2

The Council's ability to murder with seeming impunity bred a boundless arrogance. Subordinates were executed for mere larcenies or insubordination, more because of the disrespect shown to Council members than because of any threat posed to the organization. Thus, Frank James ordered his wife's brother, Russell Laudermilk, ice-picked to death because he had attempted to go into the heroin business on his own and Guy Fisher murdered his childhood companion, Ronald Bell, because Bell was suspected of stealing money from one of Fisher's girlfriends.* Confident in the skills of highly-paid defense lawyers and of the defendants' ability to prevent any witness from testifying against them, Council members brazenly carried out their murders on the streets and in crowded bars and clubs.

On repeated occasions the Council has made direct assaults on the judicial system. For example, the Government proved at trial that during Fisher's 1977 prosecution in this Courthouse he attempted to have poison placed in Judge Henry F.

---

\*   It should be noted that this murder as well as that of Robert Atkinson, a/k/a "Skeeter," occurred during the summer of 1977, while Guy Fisher was on bail awaiting trial in this Courthouse.

- 4 -

PLD:kt
3-2863/2

Werker's courtroom water pitcher -- a pitcher from which a key Government witness, Robert Geronimo, was then drinking. It apparently was a matter of indifference to Guy Fisher whether, in addition to Geronimo, Judge Werker, court personnel or Government prosecutors also drank from the pitcher. In addition, Fisher's own attorney elicited from a trial witness the fact that Fisher contemplated murdering Thomas Sear, one of the Assistant United States Attorneys in that case. As the Government demonstrated in support of its pre-trial motion for an anonymous jury, Fisher obtained a hung jury by paying a $50,000 bribe to a juror.

Fisher's attack on the judicial system was resumed after his arrest on the charges in this case in March 1983. As the pre-trial record in this case reveals, Fisher and other defendants placed a $1 million contract on the life of Leroy "Nicky" Barnes. A total of seven of the Government's witnesses at trial have had to be placed in the Federal Witness Protection Program.* Both before and during the trial, agents and police officers and their families have been threatened by Guy Fisher.

---

\*   An eighth accomplice witness disappeared shortly before his scheduled testimony.

PLD:kt
3-2863/2

B. <u>Individual Culpability</u>

The following is a brief summary of each defendant's background and involvement in this highly structured and violent criminal enterprise. The individualized discussion that follows, however, should in no way deflect attention from the criminal organization itself, as distinct from its members, and the utter destruction and despair its very existence has caused the New York City community. By operating under the threatening auspices of the Council, with all of its resources, the ability of each of these defendants to traffic in heroin and other drugs at will and to subvert the criminal justice system by threats, intimidation and murder was enhanced immeasurably. While Leroy "Nicky" Barnes has in the past been the most visible member of the Council, and because of his notoriety has come to symbolize all that is evil in a heroin enterprise of this magnitude, the public attention paid to Barnes has also tended to obscure what the evidence in this case has overwhelmingly demonstrated: the constituent organizations comprising the Council operated as a secret federation of independent narcotics businesses, and each Council member used violence and threats of violence whenever necessary to insure the success of the mutually dependent narcotics business.

PLD:kt
3-2863/2

Guy Thomas Fisher

Fisher was a member of the Council, functioned as the organizer and supervisor of one of the seven interdependent narcotics distribution business and participated in the planning and execution of a number of narcotics-related murders authorized by the Council. By 1974, Fisher had assumed the leading role on the Council of dealing with the Council's then principal source of heroin supply, Mattew Madomna. Fisher participated in the Council's discussions to murder nine persons who were either suspected police informants or who offended one or more Council members, and was actually the trigger-man in the murders of Oswaldo Peterson, a/k/a "Atlantic City Pete," Oscar Wilson, a/k/a "Chink," Carmine Pugliese, a/k/a "Mikey Pu," and Ronald Bell, who had been a long-time friend of the Fisher family. In addition, Fisher took steps to locate other witnesses who testified against Barnes, Hayden and Fisher at the Barnes 1977 trial, such as Robert Geronimo, Promice Bruce, and Inez Smart, and located Dennis Reed, who in 1979 had provided information leading to the conviction of one of Fisher's "crew" members, James Brown. In January 1978, after Leroy Barnes, with whom Fisher had been in partnership, was incarcerated on account of his conviction for operating a continuing criminal enterprise, Fisher expanded the partnership's distribution operation, recruited additional "crew"

- 7 -

PLD:kt
3-2863/2

members, developed new sources for

other drugs, such as cocaine from Brazil, phencyclidine ("PCP") and marijuana, invested substantial sums to acquire luxury automobiles and, by his own repeated admissions, invested at least $500,000 to acquire the Apollo Theatre, a naturally-known entertainment center in Harlem. Despite his brazen participation in these heinous crimes over the last ten years, Fisher has previously been convicted of only a misdemeanor offense, for which he served approximately eight months imprisonment.

Frank Alphonso James

James was one of the founding members of the Council and, like Fisher, organized and supervised one of its seven interdependent narcotics distribution business and participated in the planning and execution of a number of narcotics-related murders ordered by the Council. It was James' special role on the Council to provide security for Council members, a role for which James seemed singularly well suited, having already been convicted in September 1965 of manslaughter involving the use of a weapon, for which James served approximately 3 1/2 year's imprisonment. From time to time James also brought additional sources of narcotics to the Council, such as John Doe, a/k/a "Hugo," Freddie Galloway, a/k/a "Freddie Gonzalez" and a heroin source provided through Theodore Johnson, a/k/a "Tito". Of the nine homicides ordered by the Council, James was the trigger-man in one, the homicide in September 1975, of Joseph Beechum.

- 8 -

PLD:kt
3-2863/2

Apart from these murders, James also arranged for the murder in February 1978 of Russell Laudermilk, James' brother-in-law, through services provided by James' permanently retained "hit-squad," a group through which James had ordered a total of at least six homicides, of which at least four, (including Laudermilk's), we have reason to believe based on information provided by James Hughes were carried out.

Wallace Rice

Rice, too, was a member of the Council, organized and supervised one of the seven interdependent narcotics distribution businesses and participated in the planning of a number of the narcotics-related homicides ordered by the Council. It was Rice's special role to provide the Council with mannitol and quinine, some of which was provided in the period 1974-1976 through Inez Smart. Following his incarceration in 1977, some of the dilutants was provided to Council members by Rice through his wife, Natalie Rice, and other subordinates through whom Rice continued to deal while in prison. Given his extensive background in the heroin trade, in part evidenced by convictions in both State Court and in this Courthouse dating back as early as 1961, and having substantial sources of heroin supply prior to the formation of the Council, Rice, too, from time to time provided the Council with new sources of heroin, including Carmine Pugliese, a/k/a "Mikey Pu" and Harry Jenkins. Of the nine Council-ordered homicides, Rice participated in the Council's

PLD:kt
3-2863/2

deliberations concerning seven intended victims and actually attempted the murder of one, Lawrence Billings, whom Rice had learned was a DEA informant. Even after his incarceration in March 1977, Rice played an important role in the Council's plans to murder Inez Smart in retaliation for testimony she had given in the 1977 Barnes trial, reporting to Frank James that Inez Smart had been visiting an inmate at the Eastern Correctional facility in Napanock, New York.

In his trial testimony, Rice claimed that he terminated his involvement in narcotics after his incarceration in March 1977, and that prior to that he was no more than an occasional customer of Leroy "Nicky" Barnes. Mindful at the time that the Government was seeking forfeiture of his narcotics-related real estate investments in Harlem, Rice also testified that in the late 1960's and early 1970's, when he made his real estate investments, his income was derived not from narcotics but from policy. These claims were so thoroughly contradicted by the testimony of Leroy Barnes, Lawrence Billings, Walter Centano, Inez Smart, as well as by co-conspirator statements made to Special Agent George Williams, during the investigation in 1979-80 of Natalie Rice, and to Special Agent Nancy Burgstahler, during the reverse undercover heroin investigation in 1982 that the Court would be thoroughly justified in rejecting the whole of Rice's trial testimony as patently false.

PLD:kt
3-2863/2

## Ishmael Muhammed

Muhammad, too, was a member of the Council, served as the organizer and supervisor of one of the seven interdependent narcotics distribution businesses and participated in the planning and execution of a number of narcotics-related murders ordered by the Council. It was Muhammad's special role to supply the Council with high quality cocaine for personal use and for resale. Beginning in 1976, Muhammad also served as the Council's link to one of its sources of heroin, Murad Nercessian, a/k/a "Mickey Coco," a heroin supplier with whom Guy Fisher also dealt on the Council's behalf until at least 1980. Muhammed, like Rice, also supplied the Council with quinine, obtained, at least in part, through his wife, Helen Jones, from whom approximately three pounds of quinine was siezed in September 1980. Muhammad participated in the planning of each of the nine Council-ordered homicides that were carried out, including the attempted murder of Billings. Together with Fisher, he participated in the cold-blooded execution of Oswaldo Perterson and Oscar Wilson in August 1975, at the Hubba Hubba Club, a social club created by Muhammad for the Council in December 1974. Muhammad has successfully evaded prosecution for any crime more serious than a single misdemeanor involving possession of a weapon, for which he paid a fine, despite a decade-long involvement in heroin trafficking and murder on a vast scale.

PLD:kt
3-2863/2

Thomas Forman

Forman was also a member of Council, served as an organizer and supervisor of one of the seven interdependent narcotics distribution business and participated in the planning of a number of narcotics-related murders authorized by the Council. It was Forman's special role on the Council to act as treasurer, exacting from each of the Council members regular payments to ensure attendance at meetings, and expending funds to purchase information from co-defendant Elmer Morris, a/k/a "Coco" concerning persons suspected of being police informants and to pay witnesses, such as Lawrence Billings, to refuse to testify against Council members. Given his extensive criminal background, which includes a conviction in 1954 for assault for which he received a three-year sentence, a robbery and assault conviction in 1958 for which he received a sentence of three to six years, and a robbery, assault and burglary convictions in 1962 for which he served a ten-year sentence, it is not surprising that within months of his release from prison, James would have recommended to the Council that Forman be permitted to join. Forman participated fully in the Council's decisions to murder nine persons, including his own direct subordinate, Arnell Johnson, a/k/a "Battle Ax," a murder committed in February 1976 which, although not specifically charged as a predicate offense in the indictment, was illicited by Forman's counsel on cross-examination of a Government witness. The fact that Forman has successfully avoided even an arrest, much less prosecution, since

PLD:kt
3-2863/2

joining the Council demonstrates the insulation enjoyed by the upper echelon of this criminal organization.

Elmer Thomas Morris

Elmer Morris is unique among the defendants in this case because he cannot claim to be the product of a disadvantaged background. Instead, Morris grew up in secure economic circumstances in Tuckahoe, New York. As a high school football star, Morris obtained a college athletic scholarship. Even though Morris failed to complete college, he nevertheless obtained employment as a Tuckahoe New York Police Officer in 1968 where he earned as much as $15,000 a year. Thus, when Morris violated his oath as a police officer and became affiliated with the Council while still a member of the Tuckahoe Police Department, he did so purely out of greed. The proof at trial demonstrated that Morris, in addition to abusing his office by providing firearms training to the Council, was caught red-handed (but never prosecuted for) filling his patrol car full of electronic equipment stolen from a New York Telephone Company warehouse. After leaving the Tuckahoe Police Department in 1974, Morris joined the Guy Fisher heroin processing crew where he assisted in the distribution of hundreds of pounds of heroin. Furthermore, Morris used his contacts with law enforcement authorities to provide information to the Council concerning suspected government

- 13 -

PLD:kt
3-2863/2

informants. At $5,000 a head and knowing that he was signing their death warrents, Morris identified four individuals as government informants. All four were subsequently killed. In addition, Morris helped dump the body of a fifth victim of the Council, in Maryland. In 1981, acting on Guy Fisher's behalf, Morris attempted to receive delivery of 500 pounds of marijuana flown into a deserted Maryland airstrip by an undercover DEA agent. In March 1983, only days before his arrest in this case, Morris was arrested in Greenburgh, New York for possession of a weapon and 46 glassine evelopes containing heroin. As is the case with a number of his co-defendants, Morris has trafficked in narcotics for almost a decade without a prior criminal conviction.

James Wheelings

The proof at trial demonstrated that, although Wheelings joined the Guy Fisher organization in 1975 at a relatively low-level, he soon rose through the ranks to become Fisher's chief lieutenant in 1978. In that position, Wheelings met directly with Italian-American heroin importers and oversaw the operation of Fisher's heroin processing mills and the activities of Fisher's distributors. In part, Wheelings' advancement was due to his ready participation with Fisher in at least four homicides. (Ronald Bell, Robert Atkinson, and the two chain-saw victims).

PLD:kt
3-2863/2

By 1980, Wheelings was able to exploit his access to heroin importers by forming his own heroin processing and distribution organization. In the years 1980-1983, Wheelings supervised two mill workers, Richard Cintron and Walter Centano, and at least a dozen heroin distributors.

Despite almost a decade of continuous involvement in narcotics dealing, Wheelings had until this case never been arrested. This was accomplished by Wheelings' use of aliases and by his remaining in the background protected by layers of subordinates. Even when subordinates were arrested, Wheelings effectively precluded their cooperation with law enforcement authorities by providing them with defense counsel loyal to him.

Kenneth Thomas

Although Thomas is the least culpable of the defendants and has not participated directly in the murders charged in this case, he nevertheless has played a significant role in the Council. From sometime prior to 1975 through at least 1979, Thomas was a member of the Guy Fisher heroin processing crew. The degree of Thomas' involvement in the Fisher organization is best evidenced by his arrest in November 1976. In Thomas' apartment was found a custom-made assasin's gun equipped with a silencer, hundreds of rounds of ammunition in assorted calibers, lactose and mannitol, and assorted narcotics paraphenalia. The evidence at trial also established that Kenneth Thomas was present when Guy Fisher discussed actual and

- 15 -

PLD:kt
3-2863/2

contemplated murders. As recently as January 1983, Thomas negotiated with an undercover police officer for the sale of a substantial number of heroin quarters.

C.  The Nature of the Government's Proof

Throughout these proceedings, defendants have contended that the Government improperly relied on evidence provided by Leroy "Nicky" Barnes who is serving a sentence of life without parole as a result of his conviction in this District in 1978. It has been argued that (1) the Government sought and obtained convictions based solely on Barnes' testimony; (2) Barnes' agreement with the Government was unduly favorable to him; and (3) the Government, in any event, should have turned its back on Barnes' offer to cooperate. None of these self-serving challenges to the Government's case has any merit.

As the Court is aware, the proof against these defendants was presented through 121 witnesses, dozens of recorded conversations, several video tapes and thousands of documents. While Barnes was, of course, an important witness, his testimony was corroberated by an overwhelming mass of evidence, which included several undercover agents and six additional accomplice witnesses, none of whom had spoken to Barnes in at least five years. A number of these witnesses had never even met Barnes.

As the jury's verdict demonstrates, twelve impartial representatives of the community unanimously concluded beyond a

PLD:kt
3-2863/2

reasonable doubt that a Council of seven equal partners controlled much of the narcotics traffic in New York from 1972-1983. In addition, the jury found that this organization was responsible for a number of murders.*

Barnes was not the only witness to directly implicate defendants in Council-related homicides. Lawrence Billings, for example, testified that Rice shot him three times in the head. James Hughes testified that, as Frank James paid "hit-men," he murdered Russell Laudermilk. Conrad Brown testified about Fisher and Wheelings' involvement in the "chain-saw" killing of two individuals. Finally, Walter Centano testified concerning Fisher and Wheelings' shooting of Ronald Bell and Robert Atkinson and Fisher and Muhammad's admissions concerning their involvement in the murders of Oscar Wilson, a/k/a "Chink" and Oswaldo Peterson, a/k/a "Atlantic City Pete."

Neither is there any merit to the contention that the Government entered into any improper agreement with Barnes. As the evidence demonstrates, Barnes first approached the Government in July 1981 and, without precondition, offered to testify against major heroin dealers who he felt had betrayed him. It

---

\* Even though the jury did not convict under Count Fifteen which charged a conspiracy to murder Government witnesses, it is clear that this verdict was based on the Government's failure to prove a murder of a Government witness within the five year statute of limitations.

PLD:kt
3-2863/2

soon became apparent that Barnes had useful information against major heroin importers associated with organized crime as well as black narcotics traffickers. In addition, Barnes provided information about a number of then-unsolved murders. Rather than let dozens of major criminal figures continue to import and distribute huge quantities of heroin and rather than permit a number of murderers to continue to operate freely in this city, the Government agreed to use Barnes as a witness. As a precondition, however, Barnes was required to plead a 20 year racketeering charge and presently faces sentencing before the same judge who in 1978 sentenced him to life without parole. In return, Barnes obtained from the Government no more than an agreement to make his cooperation known to any appropriate authorities.

As a direct result of Barnes' cooperation, a total of 48 defendants have been indicted in this and other Districts on a variety of narcotics related charges. Of these defendants, five have already been convicted under the continuing criminal enterprise statute and nine others have been convicted of other narcotics charges. An additional 26 are awaiting trial in various Districts.* Additional indictments are expected as a result of Barnes cooperation.

---

\*   Several indicted defendants are fugitives, and one Beverly Ash, a former Barnes girlfriend, was murdered prior to her trial.

PLD:kt
3-2863/2

### E. Conclusion

The crimes proved at trial, -- murder and massive narcotics trafficking over the course of a decade -- are, quite simply, the most serious crimes imaginable. In a case of this sort there is little need to elaborate further on the nature of these offenses nor on the character of these criminals. These crimes warrant the most severe punishment. The public is entitled to be protected from these defendants for as long as possible.

Dated:   New York, New York

January 11, 1984

Respectfully submitted:

RUDOLPH W. GIULIANI
United States Attorney for the
Southern District of New York
Attorney for the United States
   of America

By: _____
PHILIP Le B. Douglas
BENITO ROMANO
JESS T. FARDELLA
Assistant United States Attorneys
Telephone:  (212) 791-0070